UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **In re: MP PPH, LLC** <br><br> **MP PPH, LLC** <br><br>　　　　　Plaintiff, <br><br>　　　　　v. <br><br> **EDGEWOOD MANAGEMENT CO.,** <br> **VANTAGE MANAGEMENT, INC.** <br><br>　　　　　Defendants. | Case No. 24-mc-00114 (CRC) <br> Bankr. Case No. 24-ap-10022 (ELG) |

## MEMORANDUM OPINION AND ORDER

　　　This case arises from the mismanagement of Marbury Plaza, an apartment complex in southwest Washington, D.C. that is home to about 2,500 residents. From 2015 to 2021, Marbury Plaza was owned by Plaintiff MP PPH LLC and managed by Defendant Vantage Management, Inc. During that time, the building fell into disrepair, as residents went without heating and cooling and endured leaks, mold, pests, and more.

　　　After the District of Columbia began investigating MP PPH and Vantage for housing code violations, the former filed for bankruptcy. Vantage then filed a claim in that bankruptcy, asserting that it was entitled to be reimbursed by MP PPH for the legal fees it incurred while defending against D.C.'s investigation. MP PPH followed with this lawsuit against Vantage in bankruptcy court. MP PPH alleges that Vantage breached the parties' management contract and committed various torts by failing to maintain Marbury Plaza.

　　　Vantage now moves to have this lawsuit be heard in district court. The Court will deny Vantage's motion.

I. **Background**

    A. Legal Background

Title 11 of the United States Code creates a comprehensive, uniform legal framework for bankruptcies. Because bankruptcy law is highly complex and specialized, Congress also created expert bankruptcy courts to adjudicate bankruptcy cases and other related matters. 28 U.S.C. § 151. These courts are staffed by specialized bankruptcy judges appointed by federal courts of appeals to serve limited terms. Id. § 152(a)(1). District courts may refer bankruptcy and other related cases to those specialized courts. Id. § 157(a). District courts may also take back a previously referred matter, a procedure known as "withdrawing the reference." Id. § 157(d).

When Congress first created bankruptcy courts, it permitted those courts to adjudicate and enter final judgment in all "civil proceedings arising under title 11 or arising in or related to cases under title 11." Pub. L. No. 95-598. § 240, 92 Stat. 2549 (1978). In Northern Pipeline Construction Co. v. Marathon Pipe Line Co., 458 U.S. 50 (1982), however, a fractured Supreme Court held that the broad grant of authority over cases "related to" Title 11 cases violated Article III of the Constitution. Id. at 87 (plurality op.); id. at 91–92 (Rehnquist, J., concurring in the judgment). In that case, a company filed for bankruptcy and was referred to bankruptcy court. Id. at 56 (plurality op.). The bankrupt company then sued a third party in bankruptcy court alleging state-law claims. Id. (plurality op.). A majority of the Supreme Court agreed that permitting the bankruptcy court to resolve those state-law claims would violate Article III, as Congress had vested judicial power in a court whose judges do not enjoy Article III's tenure or salary protections. Id. at 87 (plurality op.); id. at 91–92 (Rehnquist, J., concurring in the judgment).

In response to Northern Pipeline, Congress divided bankruptcy proceedings into two types: core and non-core. Bankruptcy courts may hear and enter final judgment in "all core proceedings arising under title 11, or arising in a case under title 11." 28 U.S.C. § 157(b)(1). These judgments may then be appealed to the district court. Id. § 158(a). In non-core proceedings "related to a case under title 11," bankruptcy courts may not enter final judgment without the parties' consent. Id. § 157(c). Instead, bankruptcy courts may make recommendations for the district court to review *de novo* and adopt. Id. § 157(c)(1). Congress did not expressly define core and non-core proceedings but provided a non-exhaustive list of sixteen types of core proceedings. See id. § 157(b)(2).

B. Factual Background

MP PPH owns Marbury Plaza, an apartment complex in Washington, D.C. that is home to some 2,500 residents. Compl. ¶ 3. Many residents receive housing assistance. Id.

In 2015, MP PPH and Vantage entered into the Management Agreement, under which Vantage would manage and maintain Marbury Plaza. Id. ¶ 4. The complex fell into disrepair, leaving residents without heating or cooling and forcing them to endure mold, pests, leaks, and other substandard conditions. Id. These deficiencies led the District of Columbia to investigate and sue MP PPH and Vantage for housing code violations. Id. ¶¶ 18, 25. MP PPH fired Vantage in 2021. Id. ¶ 8. The two now blame each other for Marbury Plaza's dilapidated conditions.

In 2023, MP PPH filed for Chapter 11 bankruptcy. Under this district's local rules, that bankruptcy was automatically referred to the bankruptcy court. DCt.LBR 5011–1(a); see In re MP PPH LLC, No. 23-246 (ELG) (Bankr. D.D.C. filed Aug. 31, 2023) ("Bankruptcy Docket"). Vantage filed a claim against the estate, claiming that the Management Agreement required MP PPH to indemnify Vantage for about $1.5 million in legal fees incurred while defending against

3

D.C.'s investigation and lawsuit.  See MP PPH Opp'n Ex. A.  MP PPH disputed Vantage's claim and filed this adversary proceeding in bankruptcy court against Vantage and a related company, Edgewood Management Co., in June 2024, asserting breach of contract and tort claims.  The complaint alleges that Vantage breached the Management Agreement, and that Edgewood was Vantage's alter ego during the relevant events and caused Vantage to breach the agreement.  Compl. ¶¶ 28–30.

Defendants then moved to withdraw the reference as to MP PPH's lawsuit.  They do not seek to withdraw the reference as to Vantage's claim against MP PPH's estate or any other matter related to the bankruptcy.

Meanwhile, in the underlying bankruptcy, the bankruptcy court approved MP PPH's liquidation plan in September 2024.  ECF 721, Bankruptcy Docket.  The plan divided the creditors into classes and designated Vantage as a Class 4 creditor.  Id. at 5.  The plan provides that MP PPH shall reserve funds to pay out Vantage's share of the Class 4 recovery should Vantage's claim be allowed.  Id.  If Vantage's claim is disallowed, then the reserved funds shall be distributed to other Class 4 creditors.  Id.

## II. Legal Standard

District courts must withdraw the reference when a case "requires consideration of both title 11 and other laws of the United States[.]"  28 U.S.C. § 157(d).  If a bankruptcy matter does not implicate non-bankruptcy federal law, then district courts may withdraw the reference "for cause shown[.]"  Id.

4

### III. Analysis

To begin, withdrawal is not mandatory here. MP PPH's claims are state-law tort and contract claims. Therefore, a court will not need to apply non-bankruptcy federal law to resolve them. In any case, Defendants do not argue that withdrawal is mandatory.

That leaves discretionary withdrawal, which implicates thorny constitutional questions. Because Congress did not define "cause," and the D.C. Circuit has yet to weigh in on the standard for discretionary withdrawal, the Court will begin by analyzing the factors that other courts have considered when deciding whether to withdraw the reference before applying those factors to this case.

A. Cause for Withdrawal

When evaluating whether a party has shown cause for withdrawal, courts typically employ a multifactor balancing test aimed at determining whether it would further Congress's goal of efficiently and uniformly administering federal bankruptcy law. See Holland Am. Ins. Co. v. Succession of Roy, 777 F.2d 992, 999 (5th Cir. 1985). First, courts consider whether the matter is a core bankruptcy proceeding that the bankruptcy court can adjudicate. In re Ellipso, Inc., 477 B.R. 278, 280–81 (D.D.C. 2012). Second, courts also consider whether a party is entitled to a jury trial and whether the bankruptcy court could constitutionally resolve the case. See, e.g., Sec. Inv. Protection Corp. v. Bernard L. Madoff Inv. Sec. LLC, 486 B.R. 579, 582 (S.D.N.Y. 2013). Third, courts weigh more general judicial economy concerns such as "the efficient use of judicial resources, delay and costs to the parties, uniformity of bankruptcy administration, the prevention of forum shopping, and other related factors." In re Ellipso, 477 B.R. at 280–81 (quoting Sec. Farms v. Int'l Bhd. of Teamsters, 124 F.3d 999, 1008 (9th Cir. 1997), and collecting authorities).

Prior to 2011, many courts treated the core/non-core distinction as the most important factor when deciding whether to withdraw the reference. The Second Circuit, for example, held that "[a] district court considering whether to withdraw the reference should first evaluate whether the claim is core or non-core, since it is upon that issue that questions of efficiency and uniformity will turn." In re Orion Pictures Corp., 4 F.3d 1095, 1101 (2d Cir. 1993). "[H]earing core matters in a district court," the Second Circuit observed, "could be an inefficient allocation of judicial resources given that the bankruptcy court generally will be more familiar with the facts and issues." Id. On the other hand, leaving non-core matters in the bankruptcy court could needlessly duplicate work because the district court would have to review the bankruptcy court's report and recommendation *de novo*. Id.

Then the Supreme Court decided Stern v. Marshall, 564 U.S. 462 (2011), holding that bankruptcy courts cannot enter final judgment in certain types of bankruptcy proceedings, regardless of whether the Bankruptcy Code classified the proceeding as "core." Id. at 469. Those proceedings must instead be resolved by a court whose judges enjoy Article III's tenure and salary protections. Id. at 503. Furthermore, parties may be entitled to a jury trial in a bankruptcy-related matter if Article III precludes the bankruptcy court from resolving it. See Granfinanciera, S.A. v. Nordberg, 492 U.S. 33, 50–55 (1989). Bankruptcy courts, however, cannot conduct a jury trial without the parties' consent. See 28 U.S.C. § 157(e) (Bankruptcy courts may hold jury trials "if specially designated . . . by the district court and with the express consent of all the parties."); DCt.LBR 9015–1 (granting jury-trial authority to bankruptcy judges "with the express consent of all the parties").

Following Stern, "questions of efficiency and uniformity," Orion, 4 F.3d at 1101, no longer necessarily turn on the statutory core/non-core distinction. District courts may have to

review bankruptcy courts' actions *de novo* or conduct a jury trial regardless of how the statute classifies the proceeding.

Still, the core/non-core distinction remains relevant even if its importance has waned somewhat. Congress's decision to designate some matters as "core" reflects its view that they are closely related to the underlying bankruptcy and should be handled by bankruptcy courts to the extent possible. Indeed, that a party seeking to withdraw the reference must show cause "creates a presumption that Congress intended to have bankruptcy proceedings adjudicated in bankruptcy court unless rebutted by a contravening policy." In re AgFeed USA, LLC, 565 B.R. 556, 564 (D. Del. 2016) (cleaned up). Resolving whether something is a core proceeding also could allow a court to avoid unnecessarily ruling on difficult constitutional questions.

The Court will therefore begin the discretionary-withdrawal analysis by first determining whether this suit is a core bankruptcy proceeding. Finding that this case is core, the Court will then turn to constitutional issues arising under Article III and the Seventh Amendment. Finally, the Court will weigh those factors alongside more generalized judicial economy considerations.

B. Core/Non-Core Distinction

This suit is a core bankruptcy proceeding because it involves counterclaims by a bankruptcy estate against a creditor. The Bankruptcy Code lists sixteen types of core bankruptcy proceedings. See 28 U.S.C. § 157(b)(2). One is a "counterclaim[] by the estate against persons filing claims against the estate." Id. § 157(b)(2)(C). That describes this case. Vantage filed a claim against MP PPH's estate seeking indemnification under the Management Agreement. See MP PPH Opp'n Ex. A. MP PPH then sued Vantage, alleging that Vantage breached the Management Agreement. This case therefore involves core bankruptcy proceedings, which cuts against withdrawing the reference.

Defendants offer strained counterarguments in response. First, they point out that MP PPH's complaint is not styled as a counterclaim and does not reference Vantage's claim against the estate. Defs. Reply at 4. True, but the Federal Rules of Civil Procedure—which the Federal Rules of Bankruptcy Procedure generally incorporate in adversary proceedings—do not require such formalities. See Fed. R. Civ. P. 8(a) (requiring "a short and plain statement of the claim"); id. 8(d)(1) ("No technical form is required."); Fed. R. Bankr. P. 7008 (incorporating Rule 8). And Defendants do not cite a single authority requiring a party to expressly identify a claim as a counterclaim.

Second, Defendants also argue that "Vantage's success [on] its Proof of Claim is not reliant on any purported breaches of contract or any other actions taken by" MP PPH. Defs. Reply at 4. That is irrelevant. Stern held that the fraud counterclaim at issue in that case was a core bankruptcy proceeding under 28 U.S.C. § 157(b)(2)(C), even though its resolution was not necessary to the claims allowance process. 564 U.S. at 482, 499.

MP PPH's claims against Edgewood, on the other hand, present a slightly more complicated question, as Edgewood did not itself file a claim in the underlying bankruptcy. As such, Edgewood arguably is not a "person[] filing claims against the estate" under 28 U.S.C. § 157(b)(2)(C). But MP PPH alleges that Edgewood was Vantage's alter ego and that Edgewood controlled Vantage and caused Vantage to breach the agreement between Vantage and MP PPH. In other words, MP PPH is alleging that Vantage and Edgewood are one and the same. See Zenith Radio Corp. v. Hazeltine Rsch., Inc., 395 U.S. 100, 111 (1969); iMark Mktg. Servs., LLC v. Geoplast S.p.A., 753 F. Supp. 2d 141, 162 (D.D.C. 2010). Its counterclaim against Vantage is therefore effectively a counterclaim against Edgewood as well. Other courts have held that similar claims alleging that another entity is the alter ego of a creditor are core bankruptcy

8

proceedings. See, e.g., Cent. Vt. Pub. Serv. Corp. v. Herbert, 341 F.3d 186, 192 (2d Cir. 2003); In re Madison Bentley Assocs., LLC, 474 B.R. 430, 438 (S.D.N.Y. 2012); In re Freeway Foods of Greensboro, Inc., 466 B.R. 750, 785 (Bankr. M.D.N.C. 2012); see also In re Blackman, 55 B.R. 437, 443 (Bankr. D.D.C. 1985) (noting that a claim might be a counterclaim "to whatever extent plaintiffs can show that [defendant] is an alter ego of some other defendant(s)").

C. Article III and the Seventh Amendment

Moving to the constitutional issues, the bankruptcy court may enter final judgment on some, but not all, of MP PPH's claims. Defendants are also entitled to a jury trial under the Seventh Amendment on at least some of MP PPH's claims, which the bankruptcy court cannot conduct absent the parties' consent. The bankruptcy court's limited authority supports withdrawing the reference.

1. *Article III*

The Supreme Court's decision in Stern v. Marshall supplies the governing test for whether Article III permits the bankruptcy court to adjudicate MP PPH's claims. Stern involved the convoluted bankruptcy of Vickie Lynn Marshall, more commonly known as Anna Nicole Smith. Marshall was left out of her husband's will, so she sued her stepson for allegedly defrauding her of her share of the will. Stern, 564 U.S. at 470. After her husband died, Marshall filed for bankruptcy, and the stepson filed a defamation claim against Marshall in bankruptcy court based on the fraud lawsuit. Id. Marshall counterclaimed, alleging tortious interference with her inheritance by the stepson. Id. The bankruptcy court found for Marshall on her counterclaim. Id. at 471–72.

The issue before the Supreme Court in Stern was whether the bankruptcy court could enter judgment on Marshall's counterclaim. 564 U.S. at 469. The Court first held that the

bankruptcy court was statutorily authorized to enter final judgment because Marshall's counterclaim was a core bankruptcy proceeding.  Id. at 482.

But the Court proceeded to find the statutory authorization unconstitutional, holding that Article III barred the bankruptcy court from entering final judgment because the counterclaim did not fall under the "public rights" exception.  Id. at 487.  While the Court acknowledged that its "discussion of the public rights exception . . . has not been entirely consistent," it held that to fall under the exception, a bankruptcy matter must "stem[] from the bankruptcy itself or . . . necessarily be resolved in the claims allowance process."  Id. at 499.  Marshall's counterclaim met neither criterion because it was "in no way derived from or dependent upon bankruptcy law" and was instead "a state tort action that exists without regard to any bankruptcy proceeding."  Id.

Applying Stern's test here, MP PPH's claims do not meet its first prong.  Like Marshall's counterclaim, MP PPH's claims are classic common-law claims that do not stem from the bankruptcy itself or arise under federal bankruptcy law.

Two of MP PPH's claims meet Stern's second prong, however, because the bankruptcy court would have to disallow Vantage's claim if MP PPH prevails on them.  Bankruptcy courts "shall allow" a claim against a bankruptcy estate "except to the extent that . . . such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law[.]"  11 U.S.C. § 502(a)(1); see ECF 635, Bankruptcy Docket (MP PPH objecting to Vantage's claim under section 502(a)(1)).  Here, Vantage claims that MP PPH is contractually obligated to indemnify its legal expenses from defending against D.C.'s investigation and lawsuit.  See MP PPH Opp'n Ex. A.  But the Management Agreement exempts MP PPH from its indemnification obligations under certain circumstances.  Specifically, under the Second

Amendment to the Management Agreement, MP PPH is required to indemnify Vantage for liability and expenses related to claims arising from Vantage's management of Marbury Plaza

> except for claims arising from or related to (i) the gross negligence of [Vantage] or its officers, agents or employees; (ii) intentionally wrongful acts of [Vantage] or its officers, agents or employees; (iii) acts or omissions of [Vantage] or its officers, agents or employees which are outside of the scope of authority established by this Agreement or which are in breach of the obligations of [Vantage] under this Agreement; (iv) misapplication of funds by [Vantage], its officers, agents or employees; or (v) fraud of [Vantage], its officers, agents or employees.

Second Amendment to Management Agreement § 5.

Two of MP PPH's claims map directly onto these exceptions and would discharge MP PPH's indemnification obligations if proven. Count 1 alleges that Vantage breached the Management Agreement by failing to maintain Marbury Plaza and therefore tracks exception (iii), which covers claims related to "acts . . . which are in breach of" the Management Agreement. Compl. ¶¶ 31–38; Second Amendment to Management Agreement at 3. Count 7 alleges that Vantage was grossly negligent in its management of Marbury Plaza and therefore tracks exception (i), which applies to claims related to "the gross negligence of [Vantage.]" Compl. ¶¶ 67–72; Second Amendment to Management Agreement at 3. As a result, whether the bankruptcy court must allow Vantage's claim necessarily turns on whether Vantage committed the conduct alleged in those counts. Counts 1 and 7 therefore involve public rights under <u>Stern</u> and may be adjudicated by the bankruptcy court.

The bankruptcy court cannot resolve Counts 2 through 6, however, because they are not necessary to determine whether to allow Vantage's claim. Counts 2 and 4 allege that Vantage is required to indemnify or contribute to any damages award against MP PPH in D.C.'s lawsuit because Vantage breached the Management Agreement. Compl. ¶¶ 39–44, 51–57. Count 3 alleges that Vantage's conduct amounted to ordinary negligence, which is not a basis for

11

excusing MP PPH's indemnification obligations.  Compl. ¶¶ 45–50.  While these three counts overlap with Counts 1 and 7, the bankruptcy court need not decide whether Vantage must reimburse MP PPH, or whether Vantage was negligent rather than grossly negligent, to allow or disallow Vantage's claim against MP PPH.

Counts 5 and 6 also have nothing to do with whether to allow Vantage's claim against MP PPH.  Count 5 alleges that Edgewood is vicariously liable for the damages that Vantage caused, Compl. ¶¶ 58–61, while Count 6 alleges that Edgewood tortiously interfered with MP PPH's contract with Vantage, Compl. ¶¶ 62–66.  Whether Edgewood must pay damages to MP PPH need not be resolved to decide if MP PPH is obligated to indemnify Vantage.

Finally, it is unclear whether the bankruptcy court can resolve Count 8.  Recall that the Management Agreement requires MP PPH to indemnify Vantage for D.C.'s suit unless the suit stems from Vantage's fraud.  See Second Amendment to Management Agreement § 5.  But Count 8 focuses not on the management of Marbury Plaza—the subject of D.C.'s suit—but on the parties' dealings with each other.  It alleges that Defendants defrauded MP PPH by fraudulently inducing MP PPH to sign the Management Agreement and concealing from MP PPH a subpoena issued during D.C.'s investigation into Marbury Plaza.  Compl. ¶¶ 73–78.  So even if MP PPH were to prevail on Count 8, that would say little about whether D.C.'s suit against Vantage arises from Vantage's fraud.

At the same time, Vantage's alleged fraud may make the Management Agreement—and presumably the indemnification provisions as well—voidable.  The Management Agreement specifies that disputes shall be governed by Maryland law.  Management Agreement § 27.  Maryland contract law has "long recognized that contracts obtained by fraud are not absolutely void, but are voidable at the election of the parties affected by the fraud and binding until

properly avoided." Julian v. Buonassissi, 997 A.2d 104, 119 (Md. 2010) (quotation marks omitted). It is unclear, however, whether MP PPH exercised any right to void the agreement. The complaint does allege that Defendants "were terminated" in 2021, Compl. ¶ 8, but that may have been under the Management Agreement's termination provision. See Management Agreement § 21. And under the Management Agreement, any "indemnification obligations . . . shall survive the expiration or sooner termination of this Agreement." Second Amendment to Management Agreement § 5.

The Court declines to resolve this uncertainty at this early juncture in the case and without full briefing on Maryland contract law. Suffice to say for now, the bankruptcy court may enter judgment on some of MP PPH's claims and may not enter judgment on others.

   2. *Seventh Amendment*

Defendants are also entitled to a jury trial on the claims that the bankruptcy court cannot resolve. Under the Seventh Amendment, Defendants are entitled to a jury trial if MP PPH's claims are legal in nature. See SEC v. Jarkesy, 144 S. Ct. 2117, 2128–29 (2024). But if MP PPH's claims involve public rights, then "Congress may assign [them] for decision to an agency without a jury, consistent with the Seventh Amendment." Id. at 2131; Granfinanciera, 492 U.S. at 50–55.

Here, MP PPH's claims are clearly legal in nature. MP PPH is seeking damages and its tort and contract claims are "the stuff of the traditional actions at common law tried by the courts at Westminster in 1789." Jarkesy, 144 S. Ct. at 2132. So, to the extent that MP PPH's claims do not involve public rights under Stern, Defendants are entitled to a jury trial. That means that Defendants are entitled to a jury trial at least as to Counts 2 through 6.

13

The bankruptcy court, however, cannot conduct a jury trial in this case because, at least for now, Defendants do not consent to it.  See Defs. Mot. at 3.

### 3. *Withdrawal on Constitutional Grounds*

That the bankruptcy court cannot enter final judgment on or try at least some of MP PPH's claims favors withdrawing the reference.  But it does not require immediate withdrawal.  As the Supreme Court has held, bankruptcy courts may propose findings of fact and conclusions of law for district courts to review *de novo* and enter judgment.  Exec. Benefits Ins. Agency v. Arkison, 573 U.S. 25, 36 (2014).  On that basis, district courts around the country routinely deny motions to withdraw the reference even when the bankruptcy court lacks constitutional authority to adjudicate the case.  See, e.g., In re Urb. Commons, LLC, No. 2:23-cv-7012 PA, 2023 WL 8884401, at *2 (C.D. Cal. Sept. 19, 2023); In re AgFeed USA, 565 B.R. at 564, 566; In re Northeast Indus. Dev. Corp., 511 B.R. 51, 53–55 (S.D.N.Y. 2014); In re Heller Ehrman LLP, 464 B.R. 348, 355–57, 361 (N.D. Cal. 2011).

Many courts have also recognized that a party's jury-trial right does not affect whether the bankruptcy court may handle pretrial matters.  As the Ninth Circuit has held, "allowing the bankruptcy court to retain jurisdiction over *pre-trial* matters does not abridge a party's Seventh Amendment *right to a jury trial*."  In re Healthcentral.com, 504 F.3d 775, 787 (9th Cir. 2007) (emphasis in original); see id. (citing cases from the Second, Fourth, and Fifth Circuits and six district courts).

This Court concurs.  Holding that withdrawal is appropriate whenever the bankruptcy court lacks constitutional authority to resolve the case would drastically expand the scope of mandatory withdrawal, even though Congress carefully limited mandatory withdrawal to cases that implicate non-bankruptcy federal law.  See 28 U.S.C. § 157(d).  Thus, even if the

bankruptcy court lacked authority to resolve *any* of MP PPH's claims, neither Article III nor the Seventh Amendment would compel immediate withdrawal.

D.  Judicial Economy

Because neither the statute nor the Constitution requires immediate withdrawal of this case, the Court turns finally to the general judicial economy factors. These factors include "the efficient use of judicial resources, delay and costs to the parties, uniformity of bankruptcy administration, the prevention of forum shopping, and other related factors." In re Ellipso, 477 B.R. at 280–81 (quotation marks omitted). While these factors do not all point in one direction, the balance favors denying the motion for now.

To begin, several factors are either neutral or favor withdrawing the reference. Because the bankruptcy court cannot enter final judgment as to all claims, a district court may eventually be needed to resolve the entire case. In that event, the district court may have to duplicate some of the bankruptcy court's work and familiarize itself with the facts of the case before resolving it via a dispositive motion or trial. Additionally, given that the bankruptcy court has already approved MP PPH's liquidation plan, it seems unlikely that potential delays in this case would significantly hamper the progress of the underlying bankruptcy. And the record reveals no significant reason to suspect that Defendants are engaging in forum shopping.

Even so, more factors favor keeping this case in bankruptcy court. First, this case involves claims that must be resolved to decide whether to allow a claim against a bankrupt estate. And the claims allowance process, even if it turns in part on state tort and contract law, is an important part of bankruptcy administration that Congress wished to conduct through specialized bankruptcy courts to the extent possible. Out of respect to a coequal branch of government, the Court concludes that this factor weighs heavily in favor of denying the motion

for now.  See Kirschner v. Agoglia, 476 B.R. 75, 82 (S.D.N.Y. 2012) ("[E]ffect should be given to Congress' clear intent that, whenever a bankruptcy court lacks the power to render a final judgment, it should render a report and recommendation.").

Second, while it appears that the bankruptcy court may not resolve all of this case, the parts that it can resolve are the most important parts.  If, for example, the bankruptcy court were to find that Vantage did not breach the Management Agreement, then that could end this lawsuit as a practical matter.

Third, it is far from certain that a district court will ever be needed in this case.  Trials are rare in the federal system, and many cases are resolved with little intervention by the district court.  The parties may settle or come to some other resolution.  And Defendants may change their minds and consent to adjudication by the bankruptcy court later down the road.  See Wellness Int'l Network, Ltd. v. Sharif, 575 U.S. 665, 669 (2015) ("We hold that Article III is not violated when the parties knowingly and voluntarily consent to adjudication by a bankruptcy judge.").

Fourth, it would be more efficient to leave this case in the hands of a bankruptcy court that is fully familiar with MP PPH's affairs.  This bankruptcy was filed over a year ago and has been supervised by the same bankruptcy judge the whole time.  See In re Lehman Bros. Holdings Inc., 480 B.R. 179, 195 (S.D.N.Y. 2012) ("The bankruptcy court has been overseeing and administering the Lehman bankruptcy proceedings since their inception three years ago and has been deeply involved in this adversary proceeding[.]"); In re Specialty Hosp. of Wash., LLC, 558 B.R. 471, 473 (D.D.C. 2016) ("The bankruptcy judge who has presided over the bankruptcy proceedings for the last two years . . . is fully familiar with the facts relating to the bankruptcy[.]").  That familiarity will enable the bankruptcy court to resolve MP PPH's claims

more efficiently, as Defendants are claiming that MP PPH is to blame for the mismanagement of the building.  See ECF 714, Bankruptcy Docket.

Finally, while the bankruptcy court may have to "issue a report and recommendation, rather than a final judgment" as to some of MP PPH's claims, "experience strongly suggests that having the benefit of the report and recommendation will save the district court and the parties an immense amount of time."  Kirschner, 476 B.R. at 83.

## IV. Conclusion

Given the centrality of MP PPH's claims to the bankruptcy process and the efficiencies gained by leaving this case with the bankruptcy court for now, the Court finds that withdrawal is not warranted at this time.  The bankruptcy court may preside over this case up to trial.

During the pretrial phase, the bankruptcy court may need to decide dispositive motions.  Indeed, Defendants have already filed a motion to dismiss before the bankruptcy court.  As to Counts 1 and 7, which the Court has found fall within the public-rights exception, the Court holds that the bankruptcy court may enter final judgment or, at its option should it question this Court's determination as to those counts, issue a report and recommendation for the district court's consideration.  As for the remaining counts, the Court instructs the bankruptcy court to issue a report and recommendation in lieu of disposing of those claims without the parties' consent.  Of course, should the parties consent to it, then the bankruptcy court may enter final judgment.

V. **Order**

For these reasons, it is hereby:

**ORDERED** that [1] Defendants' Motion to Withdraw the Reference is DENIED WITHOUT PREJUDICE. It is further

**ORDERED** that this case is DISMISSED WITHOUT PREJUDICE. It is further

**ORDERED** that the Clerk of Court is DIRECTED to close this case.

CHRISTOPHER R. COOPER
United States District Judge

Date: October 23, 2024